UNTIED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

J. FLEET OIL & GAS
CORPORATION, L.L.C., ET AL.            CIVIL ACTION NO. 15-2461

VERSUS                                 JUDGE S. MAURICE HICKS, JR.

CHESAPEAKE LOUISIANA, L.P.,            MAGISTRATE JUDGE HORNSBY
ET AL.

## MEMORANDUM RULING

Before the Court is Defendants Chesapeake Louisiana, L.P.; Chesapeake Operating, L.L.C.; Chesapeake Energy Corporation; and Chesapeake Energy Marketing, L.L.C.'s (collectively, "Chesapeake") "Motion for Partial Summary Judgment" (Record Document 34). Chesapeake seeks to dismiss certain claims asserted by J. Fleet Oil and Gas Production Company, L.L.C ("J. Fleet") and Martin Producing, L.L.C. ("Martin") (collectively "Plaintiffs"). For the reasons which follow, Chesapeake's "Motion for Partial Summary Judgment" is hereby **GRANTED**.

## FACTUAL AND PROCEDURAL BACKGROUND

In or around the summer of 2004, J. Fleet and Martin marketed the Martin/J. Fleet Prospect to a number of oil and gas companies as an opportunity to acquire a large contiguous block of leased acreage in which the oil and gas company could acquire a 100% working interest position in the leased acreage and have full operational control of the exploration and development of the multiple potentially productive zones and formations within the Martin/J. Fleet Prospect. On August 23, 2004, Chesapeake entered into a Participation Agreement (the "Agreement") with Martin. See Record Document 34-2 at 1. The Agreement established an area of mutual interest ("AMI") comprised of lands

1

in Caddo Parish, Louisiana. See id. As part of the Agreement, Martin agreed to assign the oil and gas leases within the AMI to Chesapeake, respectively reserving an overriding royalty interest[1] ("ORRI") on each lease assigned in a percentage amount equal to the difference between the lessor's royalty and 28%, thus providing Chesapeake with a net revenue working interest percentage in each lease within the AMI of not less than 72%. See id. Identified in Exhibit "B" to the Agreement, the assignment reads as follows:

> Assignor hereby reserves an overriding royalty interest applicable to each lease, equal to the difference between the lease royalty and 28% of all oil, gas and casinghead gas produced, saved and marketed from the lands covered by said leases. It is the intent that Assignor (Plaintiffs) shall deliver not less than a 72% net revenue interest to Assignee (Chesapeake) on each of the leases.

See id. at 10. All parties recognized that Martin would transfer or assign one-half of the Martin/J. Fleet ORRI to J. Fleet and that Martin was acting for itself and on behalf of J. Fleet.

The Agreement was first amended on November 17, 2004, to modify and expand the AMI. See id. at 13. On April 4, 2007, the Agreement was amended a second time to reduce the amount of ORRIs owned by J. Fleet in the AMI. See id. at 16. Pursuant to the Agreement, Chesapeake entered into seven contracts of assignment with J. Fleet, whereby Chesapeake assigned an ORRI in the AMI to J. Fleet. See Record Document 34-3. Each of the seven assignments to J. Fleet contained the following express provision:

> Proceeds of production attributable to the overriding royalty interest assigned herein shall be due Assignee from date of first production attributable to the particular lease assigned herein.

---

[1] J. Fleet argues it agreed to sell its prospect for cash and the retention of a cost free net revenue interest ("NRI") from the lessee's working interest. See Record Document 1 at 8. However, the Agreement itself uses the term "overriding royalty interest" ("ORRI"). See Record Document 34-2 at 1. The Court addresses this issue in detail later in its analysis.

2

> Said overriding royalty interest shall be free of all development, production, and operating expense of any wells drilled on the subject lands or land pooled therewith. Said overriding royalty interest shall bear and pay its portion of gross production taxes, pipeline taxes, and all other taxes assessed against the gross production subject to said overriding royalty interest.

See id. Exhibits B-O.

J. Fleet alleges that from the beginning of payment of J. Fleet's ORRI Chesapeake was improperly deducting various costs and expenses from J. Fleet's ORRI in violation of the specific contractual agreements among the parties. See Record Document 1 at 15. J. Fleet alleges the improper deductions include costs such as compression costs, fuel usage and gathering costs as well as other costs or expenses incident to the production and sale of the oil and gas including, but not limited to, costs and expense of exploration, drilling, development, operating, marketing and all other costs. See id. Chesapeake allegedly deducted these costs without always disclosing what deductions were being made. See id. J. Fleet alleges Chesapeake is in breach of their contractual obligation to pay J. Fleet its ORRI from Chesapeake's working interest without any such deductions. See id. J. Fleet asserts Chesapeake's violations have resulted in Chesapeake improperly claiming in excess of $1 million for itself at the expense of and damage to J. Fleet. See id. at 16.

On or about December 17, 2013, J. Fleet sent a demand letter to Chesapeake demanding full and proper payment for all ORRI payments due and owing on all wells and units under the Agreement and the seven contracts of assignment. See Record Document 1-1 at 104. On February 28, 2014, Chesapeake responded to J. Fleet's demand letter admitting it was deducting post-production costs from J. Fleet's ORRI. See

id. at 113. Chesapeake refused to cease deducting development, production, and operating expenses or costs from J. Fleet's ORRIs, resulting in J. Fleet filing the instant suit on October 2, 2015. See Record Document 1. J. Fleet seeks: (1) a declaratory judgment pursuant to 28 U.S.C. § 2201; (2) a judgment of accounting; (3) a prohibitory injunction; (4) damages for Chesapeake's intentional, bad-faith breach of contract; and (5) damages for Chesapeake's intentional breach of fiduciary duties owed to J. Fleet. See id. at 17-21. Martin filed a Motion to Intervene on May 2, 2016, and was added to the lawsuit on May 3, 2016. See Record Document 17. Chesapeake filed a Motion for Partial Summary Judgment on August 25, 2016, seeking to dismiss Plaintiffs' claim that Chesapeake improperly deducted post-production costs. See Record Document 34.

## LAW AND ANALYSIS

I.     **LEGAL STANDARDS**

    **A. SUMMARY JUDGMENT**

Rule 56 of the F.R.C.P. governs summary judgment. This rule provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R.C.P. 56(a). Also, "a party asserting that a fact cannot be or is genuinely disputed must support the motion by citing to particular parts of materials in the record, including ... affidavits ... or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." F.R.C.P. 56(c)(1)(A) and (B). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... grant summary judgment." F.R.C.P. 56(e)(3).

4

In a summary judgment motion, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings ... [and] affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986) (internal quotations and citations omitted). If the movant meets this initial burden, then the non-movant has the burden of going beyond the pleadings and designating specific facts that prove that a genuine issue of material fact exists. See Celotex, 477 U.S. at 325, 106 S.Ct. at 2554; see Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). A non-movant, however, cannot meet the burden of proving that a genuine issue of material fact exists by providing only "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Little, 37 F.3d at 1075.

Additionally, in deciding a summary judgment motion, courts "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is when both parties have submitted evidence of contradictory facts." Id. Courts "do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Id.

### B. CONTRACT INTERPRETATION

"Contracts have the effect of law for the parties" and the "[i]nterpretation of a contract is the determination of the common intent of the parties." La. Civ.Code arts.1983 and 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. "When the language of a contract is clear and unambiguous, it must

5

be interpreted solely by reference to the four corners of that document." Dickson v. Sklarco L.L.C., 2013 WL 1828051, at *3 (W.D. La. Apr. 29, 2013), citing Tammariello Properties, Inc. v. Med. Realty Co., Inc., 549 So.2d 1259, 1263 (La. App. 3 Cir. 1989).

Words of art and technical terms must be given their technical meaning when the contract involves a technical matter, and words susceptible of different meanings are to be interpreted as having the meaning that best conforms to the object of the contract. See La. Civ. Code arts. 2047 and 2048. In Louisiana, "[p]arol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless there is ambiguity in the written expression of the parties' common intent." Blanchard v. Pan-OK Prod. Co., Inc., 32,764 (La. App. 2 Cir. 4/5/00), 755 So.2d 376, 381. "A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue or when the language used in the contract is uncertain or is fairly susceptible to more than one interpretation." Id.

When a contract provision relating to mineral rights is ambiguous on a pivotal issue, the Louisiana Supreme Court and Courts of Appeal have interpreted the provision as having the meaning that best conforms to the object of the contract in light of the nature of the contract, equity, and usages, including extrinsic evidence as to custom and practices in the oil and gas industry. See Musser Davis Land Co. v. Union Pac. Res., 201 F.3d 561, 565-67 (5th Cir. 2000); Henry v. Ballard & Cordell Corp., 418 So.2d 1334, 1339-40 (La. 1982).

## II. ANALYSIS

### A. Plaintiffs Retained an Overriding Royalty Interest

At issue is whether Chesapeake assigned an ORRI or a cost-free net revenue interest ("NRI") to Plaintiffs. The difference in characterization is significant. Chesapeake

asserts the assignments unambiguously provide that Chesapeake assigned "an overriding royalty interest … payable out of the oil and gas leases." Record Document 41 at 2. Plaintiffs ask the Court to look beyond the formalities of the transaction and find their interest was not an ORRI, but rather a cost-free NRI; and that the assignments were actually subleases. See Record Document 39 at 18. Although Plaintiffs are correct that the parties entered into subleases rather than assignments, this distinction does not detract from or affect the fact that Plaintiffs obtained an ORRI, not a cost-free NRI.

Louisiana law requires that courts look beyond the superficial formalities of a transaction and examine the substance of an agreement to determine the true nature of the transaction and the rights, duties, and obligations created therein. See Howard Trucking Co. Inc. v. Stassi, 474 So.2d 955, 960 (La. App. 5th Cir. 1985), aff'd 485 So.2d 915 (La. 1986). The distinction between an assignment and a sublease is that in an assignment, the lessee transfers all of his rights in a lease, whereas in a sublease, the lessee retains some control or interest in the lease. See Joslyn Mfg. Co. v. T.L. James & Co., 836 F.Supp. 1264, 1270 (W.D. La. 1993). The substance of the assignments make it clear that Plaintiffs retained an interest in the leases – "the assignment shall reserve an overriding royalty interest to Martin…." Record Document 34-2 at 1. Louisiana courts have long held that the reservation of an overriding royalty interest is, in and of itself, sufficient to "stamp the transfer as a sublease." Bond v. Midstates Oil Corp., 53 So.2d 149, 154 (La. 1951). Therefore, it is clear that the "assignments" between Plaintiffs and Chesapeake were in fact subleases. However, the main issue is not whether Plaintiffs' interest was subleased or assigned; but whether Plaintiffs' retained interest is classified as an ORRI or a cost-free NRI.

7

Plaintiffs argue that only the owner of executive rights over oil and gas can grant oil and gas leases by which the lessor retains a share of the production free of cost, *i.e.*, a royalty. See Record Document 39 at 20. Once the oil and gas lease is granted, the lessee (Plaintiffs) becomes the owner and holder of all obligations to develop the leased premises. See La. R.S. § 31:122. Plaintiffs contend that the lessee, known in the oil and gas industry as the "working interest owner," can then transfer all or part of his development rights, duties, and obligations by contract and in doing so may create a contractual right to share in the proceeds of the sale of production. See Record Document 39 at 20. It is Plaintiffs' belief that the retention of a right to share in the proceeds of the production by a working interest owner is a revenue interest, not a royalty. See id. Plaintiffs assert that such a retained revenue interest is commonly referred to an "overriding royalty" – even though it is not a royalty as defined by Louisiana law. See id.

Plaintiffs again ask the Court to look beyond the formalities of the Agreement and examine the substance to determine that Plaintiffs' interest was a cost-free NRI rather than an ORRI. However, after doing so, the Court finds Plaintiffs' interest was indeed an ORRI. Plaintiffs' argument is flawed in two ways: (1) Chesapeake never claims Plaintiffs' interest is a regular royalty, but rather an overriding royalty interest and (2) the term "overriding royalty interest" is a defined, technical term used throughout the agreements by sophisticated parties, making the parties' intent unambiguous.

"'Overriding royalty' is a term of art, pregnant with meaning and legal consequences of which defendants as sophisticated parties surely were aware." Shell Offshore, Inc. v. FMP Operating Co., 1988 WL 125455, at *3 (E.D. La. 1988). An "overriding royalty" is "[a]n interest in oil and gas produced at the surface, free of the

expense of production, and in addition to the usual landowner's royalty reserved to the lessor in an oil and gas lease." Patrick H. Martin and Bruce D. Kramer, Williams and Meyers, Oil and Gas Law, § 418.1 (2015). In the parties' Participation Agreement, Plaintiffs agreed that:

> [Plaintiffs] shall simultaneously assign and deliver to Chesapeake 100% interest in the Leases. The assignment shall be subject to (i) all the terms and conditions of each of the Leases and (ii) shall reserve an overriding royalty interest to [J. Fleet] equal to the difference between the existing lease royalty and 28%.

Record Document 34-2 at 1. The parties recognized the overriding royalty interest would be reserved by Plaintiffs in addition to the "existing lease royalty." See id. The parties' characterization of the interest fits squarely within the traditional definition of an "overriding royalty." The Agreement's language and the definition of an "overriding royalty" make it clear that the parties did indeed intend to create an ORRI, rather than a cost-free NRI.

After examining the substance of the Agreement, the Court believes it is unambiguous that the parties created an ORRI. In Shell, the Louisiana federal court rejected a nearly identical attempt to discard the plain language of an overriding royalty reservation. There, Shell had assigned an oil and gas lease as part of a farmout agreement, but reserved an interest in the lease, which reservation explicitly characterized the interest as an "overriding royalty." See Shell Offshore, Inc., 1988 WL at *1. Shell later filed suit, arguing that it was being paid as a working interest owner, rather than an overriding royalty interest owner. See id. at *2. Despite the plain language of the assignment, the defendants argued that the reservation created something called a

9

"hybrid working interest," and, alternatively, that the language was ambiguous, requiring the admission of parol evidence. See id.

The court addressed the defendants' argument (which is identical to Plaintiffs' argument here) and stated:

> Defendants cite Delta Drilling Co. v. Maxwell D. Simmons, et al., 338 S.W.2d 143 (Tex.1960), for the proposition that the label applied to an interest is not dispositive concerning its true nature and that the court must make the final determination on that issue. I agree, but in making this final determination, I can do no more than look to the document creating the interest so as to understand the interest's characteristics. Naturally, this investigation must take into account how the interest is designated by the contracting parties, because that designation says a great deal about the parties' intention concerning the nature of the interest. More specifically, the term "overriding royalty" is not merely an empty label. It is a useful substantive term which parties can employ to signify the existence of contractual conditions which would otherwise have to be described in minute detail. Only if other aspects of the agreement are wholly inconsistent with use of the term would it be proper to recharacterize the interest created. The court ultimately held that, because the rest of the agreement was not "wholly inconsistent" with the term, the assignment unambiguously created an overriding royalty interest, and parol evidence was excluded.

See id. at *3.

Here, even if the parties had not used the term "overriding royalty interest," which unambiguously establishes their intent that Plaintiffs were reserving such an interest, the parties' broader arrangement is not only "wholly []consistent" with that intent, it clearly reinforces it. Plaintiffs, in their sur-reply, argue that Chesapeake fails to rely on a single case that was decided under or cites to Louisiana law.[2] See Record Document 44 at 2. However, there are Louisiana cases which support Chesapeake's position.

In Agurs v. Amoco Prod. Co., 465 F.Supp. 154, 157 (W.D. La. 1979), the court, interpreting Louisiana law, considered a party's argument that a certain stipulated interest

---

[2] Although Shell was decided by the Eastern District Court of Louisiana, the court applied Texas state law.

10

was in the nature of rental, rather than an overriding royalty, despite the plain language of the relevant agreement. The court rejected the argument, reasoning as follows:

> Contrary to defendant's assertions, and taking the instrument as a whole, we are convinced that the royalty stipulated is an overriding royalty, not rental royalty. First, we are persuaded by the use of the term 'overriding royalty' throughout the 1962 agreement. The parties to the agreement are experienced oil men and must have had knowledge of the denotation and connotations of the phrase. Had the parties intended that the stipulated royalty be treated as rental, it would have been easy enough to so provide.

Id. at 158.

Here, as in Agurs, the term "overriding royalty interest" is explicitly and repeatedly used throughout the parties' agreements. J. Fleet, Martin, and Chesapeake all have extensive experience in the oil and gas industry and are presumed to have had knowledge of the denotation and connotations of the phrase. Additionally, language used throughout the parties' agreement makes a clear distinction between an ORRI and a NRI. In each of the assignments, there are references to a NRI owned by Chesapeake side-by-side with references to an ORRI retained by Plaintiffs. Had the parties intended that Plaintiffs' interest be a NRI, it would have been easy enough to so provide. Accordingly, the Court finds the agreements unambiguously create an ORRI.

### B. Chesapeake was Entitled to Deduct Post-Production Costs

In Louisiana, the general rule is that post-production costs are shared *pro rata* unless a lease says otherwise. See Magnolia Point Minerals, L.L.C. v. Chesapeake Louisiana, LP, 2013 WL 3989579, at *4 (W.D. La. 2013); Merrit v. Southwestern Electric Power Co., 499 So.2d 210 (La. App. 2 Cir. 1986). Louisiana, as well as the oil and gas industry in general, makes a distinction between production costs and post-production costs. It is generally accepted that the production phase of oil and gas operations

11

terminates at the wellhead when the minerals are reduced to possession. See Babin v. First Energy Corp., 96-1232 (La. App. 1 Cir. 3/27/97), 693 So.2d 813, 815. Post-production costs are those costs and expenses incurred after the production has been discovered and delivered to the surface of the earth. Such "subsequent to production" costs generally include those related to taxes, transportation, processing, dehydration, treating, compression, and gathering. See id.; see also Williams & Meyers, Manual of Oil & Gas Terms (13th ed. 2006). While the peculiarities of individual lease provisions may provide otherwise, the general rule is that a royalty owner is liable for a proportionate share of the costs incurred subsequent to production. See id.

Plaintiffs allege that they bargained with Chesapeake and came to an agreement that Chesapeake would only deduct Plaintiffs' *pro rata* "portion of gross production taxes, pipeline taxes, and all other taxes" from their ORRI. See Record Document 39 at 17. Plaintiffs contend the phrase "all development, production, and operating expense[s]" explicitly prohibits Chesapeake from deducting any other expenses, including those that might be labeled "post-production costs." See id. Conversely, Chesapeake argues that the failure of the parties to specifically include any "post-production costs" should be interpreted to mean that Chesapeake has a right to deduct these costs from the ORRI. See Record Document 34 at 1. Plaintiffs believe their interpretation of the Agreement and assignments is a reasonable one which creates ambiguity, and argues for the admission of parol evidence, specifically the affidavit testimony of James Morgan and Charles Martin. However, after reviewing the language of both the Agreement and assignments the Court finds the parties unambiguously intended to share *pro rata* "post-production" costs.

Looking at the provision in question, found in Exhibits "B"-"O" (Record Document 34-3), the parties agreed the ORRI would be "free of all development, production, and operating expense[s]," while Plaintiffs agreed to "bear and pay its portion of gross production taxes, pipeline taxes, and all other taxes assessed against the gross production…." Record Document 34-3 at 1. Since the provision makes no mention of any post-production costs whatsoever, the Court finds the parties unambiguously only intended to exclude production costs.

Plaintiffs argue the provision "free of all development, production, and operating expense" does include post-production expenses, specifically the term "develop." See Record Document 44 at 3. Plaintiffs suggest the term "develop," as defined in Broussard v. Hilcorp Entergy Co., 09-449 (La. 2009), 24 So.3d 813, 820, "contemplates any step taken in the search for, capture, production and marketing of hydrocarbons." "Development in this sense is not only the exploration for, but the exploitation of, or the capture and marketing of, the minerals…." Waseco Chem. & Supply Co. v. Bayou State Oil Corp., 371 So.2d 305, 307 (La. App. 2 Cir. 1979). However, as Chesapeake points out, Waseco referred to development "in the sense" of the lessee's duty to his lessor to develop and operate the leased land, and not to assessments of costs. See id. If applied in the context of the instant matter, development is "the drilling and bringing into production of wells in addition to the exploratory or discovery well on a lease." Williams & Meyers, Manual of Oil & Gas Terms (16th ed. 2015), p. 258.

There is a tremendous amount of support for Chesapeake's claim that "development" costs are not post-production costs. In Wellman v. Energy Res., Inc., 210 W.Va. 200, 210 (2001), the court stated that, "Two states, Texas and Louisiana, have

13

recognized that a lessee may properly charge a lessor with a *pro rata* share of such post-production (as opposed to production or development) costs." Additionally, a Texas court found development costs were production costs, as opposed to post-production costs. See Chesapeake Expl., L.L.C. v. Hyder, 427 S.W.3d 472, 480 (Tex. App. 2014), aff'd, 483 S.W.3d 870 (Tex. 2016). In further support, a 2004 article in the West Virginia Law Review explained expenses "included in the category of production costs are: exploration; geological surveys; drilling; *development*...." R. Cordell Pierce, Making A Statement Without Saying A Word: What Implied Covenants "Say" When the Lease Is "Silent" on Post-Production Costs, 107 W. Va. L. Rev. 295, 308 (2004) (emphasis added). Although not Louisiana law, the Court finds Chesapeake's definition of "development" to be in the correct context and on point. Therefore, the term "development," as it is written in the provision, does not include marketing costs, *i.e.*, post-production costs.

Plaintiffs next contend the term "all" encompasses "each and every part of production." See Record Document 44 at 3. However, as previously discussed, Louisiana makes a distinction between production and post-production costs. Therefore, Plaintiffs' argument that each and every part of production extends to post-production costs has no merit since production and post-production are two separate, distinct categories.

Plaintiffs finally argue the word "marketed," found in Exhibit "B" to the Agreement (Record Document 34-2 at 10), which in pertinent part reads, "equal to the difference between the lease royalty and 28% of all oil, gas and casinghead gas produced, saved and marketed from the lands covered by the lease," coupled with the cost-free language in the assignments illustrates that the parties intended for Plaintiffs' ORRI to be free from marketing, *i.e.*, post-production, costs. See Record Document 44 at 4. However, the Court

14

does not find the term "marketed" applicable to the allocation of costs. Within the context of the provision, "marketed" refers to the gas sold by Chesapeake from the leased lands.[3]

Chesapeake cites two cases to support its claim that the provision "free of all development, production, and operating expense" does not include post-production costs: Martin v. Glass, 571 F.Supp. 1406 (N.D. Tex. 1983), aff'd, 736 F.2d 1524 (5th Cir. 1984) and Hyder, 427 S.W.3d 472 (Tex. App. 2014), aff'd, 483 S.W.3d 870 (Tex. 2016). In Martin, the lessee, Minerals, Inc., assigned its interest to Wes-Mor Drilling Inc. ("Wes-Mor") while reserving an overriding royalty interest. See Martin, 571 F.Supp. at 1410. After drilling two producing gas wells, John Glass (a successor of Wes-Mor) charged Minerals, Inc. for certain compression costs incurred subsequent to production. See id. Minerals, Inc. filed suit against Glass for its portion of proceeds of productions "free and clear of all cost of exploration, development, completion and operation…." Id. The court went through a thorough analysis of the standard royalty provision and concluded that, "an overriding royalty is, first and foremost, a royalty interest." Id. at 1416. Having reached that conclusion, the court then stated, "[T]he overriding royalty provisions provide that said interests shall be free and clear of all costs of drilling, exploration, development, completion and operating expenses … [c]learly, the overriding royalty clauses refer only to costs incident to getting gas to the surface." Id. at 1416-17. The court reasoned that

---

[3] Plaintiffs also argue interpreting the phrase "development, production, and operating expense" to include post-production costs is supported by Plaintiffs' affidavit testimony regarding both the gas industry custom in Louisiana and their own intent in entering into the relevant agreements. See Record Document 44 at 4. However, "[w]hen the language of a contract is clear and unambiguous, it must be interpreted solely by reference to the four corners of that document." Dickson, 2013 WL at *3, citing Tammariello Properties, Inc, 549 So.2d at 1263. Since the Court finds the language of the agreements to be clear and unambiguous, the Court cannot look outside the four corners of the documents. Accordingly, Plaintiffs' affidavit testimony will not be considered.

since the assignments made no mention of post-production costs, the parties had not intended to exclude them.

Chesapeake uses <u>Hyder</u> to illustrate the language needed to modify the default rule. In <u>Hyder</u>, the overriding royalty provision read, "a perpetual, cost-free overriding royalty." <u>See</u> <u>Hyder</u>, 427 S.W.3d at 478. The court distinguished <u>Hyder</u>'s "cost-free" language from the language in <u>Martin</u> "because it d[id] not limit the types of costs to be excluded from the overriding royalty to production costs alone." <u>Id.</u> at 480. "<u>Martin</u> expressly limited the costs that were to be excluded from the overriding royalty to exploration, development, drilling, completion, and operation costs—all of which are production costs, as opposed to post-production costs." <u>Id.</u>

Here, the language is much more similar to that in <u>Martin</u> than in <u>Hyder</u>. The parties expressly limited the types of costs to be excluded from the ORRI as "all development, production, and operating expense[s]." As discussed previously, "development, production, and operation expense[s]" all refer to production costs, as opposed to post-production costs. Therefore, since the provision made no mention of post-production costs, the parties did not intend to exclude them.

Plaintiffs argue these cases are inapplicable to the instant suit because: (1) they involve Texas law and (2) the provisions in both <u>Martin</u> and <u>Hyder</u> contain "at the well" language – language not found in any agreement between Plaintiffs and Chesapeake. <u>See</u> Record Document 44 at 5. First, although decisions of other jurisdictions are not binding on the courts of Louisiana, they can be persuasive. <u>See</u> <u>Monochem, Inc. v. East Ascension Tel. Co.</u>, 195 So.2d 748 (La. App. 1 Cir. 1967). Louisiana courts have relied on Texas decisions regarding the same subject matter and very similar contract

16

provisions. See Merritt, 499 So.2d at 214. In fact, the court in Martin in its ruling relied heavily on the Fifth Circuit's interpretation of Louisiana law in Freeland v. Sun Oil Co., 277 F.2d 154 (5th Cir. 1960). Additionally, both states recognize the general rule that post-production costs are shared *pro rata* unless a lease says otherwise. See Magnolia Point Minerals, L.L.C., 2013 WL at *4; Martin, 571 F.Supp. at 1410.

Next, Plaintiffs argue that the provisions in both Martin and Hyder are inapplicable because they contain "at the well" language. "At the well" determines the point of valuation where the gas is brought to the surface, and the price of such gas is based on the value before processing and does not include increases in value from processing or transportation. R. Cordell Pierce, Making A Statement Without Saying A Word: What Implied Covenants "Say" When the Lease Is "Silent" on Post-Production Costs, 107 W. Va. L. Rev. 295, 304 (2004). Consequently, for royalties paid "at the well," the lessors "may be charged with processing costs ... [meaning] all expenses subsequent to production, relating to the processing, transportation, and marketing of gas." Id.

Here, Plaintiffs retained an ORRI of "all oil, gas and casinghead gas produced, saved, and marketed from the lands covered by said leases." Plaintiffs are correct that courts do distinguish this "all products" provision from "at the well" provisions; but this distinction does not lead to a different analysis or result. See Chesapeake Expl., L.L.C. v. Hyder, 483 S.W.3d 870, 874 (Tex. 2016) ("Specifying that the volume on which a royalty is due must be determined at the wellhead says nothing about whether the overriding royalty must bear postproduction costs").

The decision in Yturria v. Kerr-McGee Oil & Gas Onshore, LP, 2006 WL 3227326 (S.D. Tex. Nov. 6, 2006), aff'd sub nom. Yturria v. Kerr-McGee Oil & Gas Onshore, LLC,

291 F.Appx. 626 (5th Cir. 2008),[4] is insightful. There, even though the ORRI was of "all plant products," the court still looked to the language of the provision to see if post-production costs were excluded.[5] See id. at *10. The court acknowledged the defendant's cited case dealt with a lease containing "market value at the well" language, but still found the case "provide[d] guidance in determining a lessee's royalty payment." See id. After analyzing the "all plant products" provision together with the "post-production costs" provision, the court found the language unambiguously excluded post-production costs because such terms were specifically listed in the agreement. See id. at *2, *10 ("Lessor's royalty shall never bear … any part of the costs or expenses of production, *gathering, dehydration, compression, transportation, manufacture, processing, treatment or marketing* of the oil or gas from the leased premises") (emphasis added).

Comparing the "post-production costs" provision in Yturria with the production costs provision in the instant matter, it is evident that Plaintiffs have failed to modify Louisiana's general rule. While the plaintiffs in Yturria specifically listed eight post-production costs to be excluded, Plaintiffs here have failed to list even one. As discussed in detail above, "development, production, and operating expense[s]" are all recognized as production costs. Therefore, although the ORRI is subject to "all oil, gas and casinghead gas" produced, Plaintiffs failed to modify Louisiana's general rule when they failed to list a single post-production cost to be excluded. As was the case in Martin, since the assignments made no mention of post-production costs, the parties did not intend to

---

[4] Kerr-McGee Oil & Gas Onshore, LP and Kerr McGee Oil & Gas Onshore, LLC are two separate entities and both were lessees in this dispute. See Yturria, 291 F.Appx. at 627 (5th Cir. 2008).

[5] "[T]he parties modified the general rule by agreement by requiring Defendants to pay Plaintiffs' royalty based on 'all' plant products or revenue derived from the leased premises *and* instructing that Plaintiffs' royalty payments 'shall never bear' and 'shall not be subject' to any costs or expenses for production, transportation, marketing, etc." Id. at *10 (emphasis added).

exclude them. Accordingly, the Court finds the parties unambiguously intended to share *pro rata* post-production costs.

## CONCLUSION

After due consideration of the specific language used within the four corners of the Agreement and accompanying assignments, the Court finds that the terms are clear and unambiguous and there is no genuine dispute as to a material fact. Here, Plaintiffs reserved ORRIs in the lands covered by the Agreement. Said ORRIs did not expressly exclude post-production costs. Therefore, under Louisiana law, Chesapeake possessed full contractual authority to deduct post-production costs before making royalty payments to Plaintiffs. Accordingly, Chesapeake's "Motion for Partial Summary Judgment" (Record Document 34) dismissing Plaintiffs' claims that Chesapeake improperly deducted post-production costs is hereby **GRANTED**.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 22nd day of March, 2018.

_____
S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT